UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

In re:

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP

       Debtor,

_____/

Case No19-17544 - SMG
Chapter 11

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP,

       Plaintiff

v.

MDG POWERLINE HOLDINGS, LLC
AND XBK MANAGEMENT LLC,
d/b/a XTREME ACTION PARK,

       Defendants.

Adversary Proceeding
No. 19-01230

_____

## FIRST AMENDED COMPLAINT

Plaintiff, Seven Stars on the Hudson Corporation, d/b/a Rockin' Jump, debtor and debtor-in-possession ("Debtor"), sues the Defendants MDG Powerline Holdings, LLC ("Landlord") with a principal address located at 18001 Collins Avenue, 31st Fl., Sunny Isles Beach, Florida and XBK Management, LLC, d/b/a

1

Xtreme Action Park ("Xtreme") with a principal address located at 5300 Powerline Road, Ste. 210, Ft. Lauderdale, Florida, and alleges as follows for its First Amended Complaint:

1) This adversary proceeding alleges causes of action against the Defendants for: (i) breach of the lease including the breach of the implied duty of good faith and fair dealing, (ii) violation of the unfair and deceptive trade practice act under Fla. Stat. §§ 501. 201 et seq., and (iii) tortious interference with business relationships.

2) The Court has jurisdiction over this adversary proceeding under 28 US.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (M).

3) Venue is proper before this Court under 28 U.S.C. § 1409.

4) On June 5, 2019, the Debtor commenced the above stated main bankruptcy case with the filing of a voluntary petition.

5) At all relevant times, the Debtor was a corporation, duly organized under the laws of the State of Florida with its principal place of business located in Ft. Lauderdale, Florida.

6) Upon information and belief, at all relevant times, Defendant Landlord was a limited liability company, formed under the laws of the State of Florida, with its principal place of business located in Sunny Isles Beach, Florida.

7)      Upon information and belief, at all relevant times, Xtreme, was a limited

        liability company, formed under the laws of the State of Florida, with its

        principal place of business located in Ft. Lauderdale, Florida. Upon further

        information and belief, a principal of the Landlord has an ownership interest

        in Xtreme.

**THE LEASE**

8)      The Debtor is the tenant under the terms of a written commercial lease

        agreement between Debtor and Landlord (the "Lease" or the "Agreement").[1]

        Debtor paid three months' rent as a deposit totaling approximately $115,000.

9)      The initial term of the Lease is ten (10) years beginning on the commencement

        date, November 23, 2015. The Lease also provides for options to renew for

        three additional five (5) year terms. Since the inception of the Lease, Debtor

        has continuously occupied a portion of the commercial premises located at

        5300 N. Powerline Road, Ft. Lauderdale, FL hereinafter referred to as the

        "Premises". A true and correct copy of the Lease Agreement with the First

        Amendment is annexed as Exhibit 1.

10)     A Second Amendment to the Lease was made and entered into the Landlord

        and Debtor as of June 6, 2016 ("Second Amendment"). A true and correct

---

[1]      The Debtor is also the franchisee under the terms of a franchise agreement dated
December 5, 2014. Under the terms of the franchise agreement, the Debtor was obligated to pay
six percent (6%) of gross revenues as royalty fees.

3

copy of the Second Amendment to the Lease is annexed as Exhibit 2. A third amendment to the Lease was made and entered into November 2016. A true and correct copy of the Third Amendment to the Lease is annexed as Exhibit 3.

11) Per the Second Amendment, the Premises consists of a portion of Bays 6 and 7 of the first floor of a subdivided commercial unit (approximating 18,200 square feet), and a portion of Bays 6, 7 and 8 of the second floor (approximating 2,900 square feet). The Premises is housed within a larger space occupied by co-defendant Xtreme a gym and basketball/volleyball facility.

12) Under the terms of the Lease as amended by the Second Amendment, Debtor's gross rent obligation was to begin on the earlier of the issuance of a certificate of occupancy or September 1, 2016 with an agreed upon escalation every year. The initial monthly gross rent was $30,151.52.

13) Jens Berding and Eddy Manzo-Berding, the owners of Debtor, each executed a limited guarantee not to exceed the amount of one year of the Gross Rent.

**CONSTRUCTION AND OPENING OF THE BUSINESS**

14) As set forth in the Lease, the primary use of the Premises is as an indoor trampoline park and family fun center.

4

15) Although the Premises is situated in a commercial area among a number of warehouses, the Landlord represented to the Debtor and its owners that the entire facility, comprised of over 200,000 sq. feet of warehouse space was in the process of being converted to an entertainment mall geared towards family entertainment. The Landlord represented that there would be a number of vendors in the space catering to families, including restaurants.

16) The Debtor obtained financing totaling $1.4 million from Wells Fargo for the build-out of the Premises as a franchised trampoline facility, and construction began in or about mid of 2016.

17) In addition to the construction of the Premises, the Debtor also used working capital of approximately $140,000 to contribute ~45% to the buildout costs of bathrooms in Xtreme and reimburse Landlord for the cost of HVAC equipment.

18) The Lease also anticipated that there would be an operating agreement which would govern the operation of the entertainment mall and delineate the rights and obligations of the tenants as to each other. To date, and despite multiple communications by Debtor to the Landlord, no such agreement has been executed.

19) The Lease obligates the Landlord to maintain the primary ingress and egress to the Premises the "Access Point" during Debtor's business hours. The

Landlord was further obligated "not to inhibit passage of patrons through the Access Point during any hours of operation" that the parties had agreed upon.

20) The Lease also contained marketing requirements. Specifically, the Debtor was required to "spend no less than" $25,000 per year for marketing which was required to reference the property location (5300 Powerline Road). The Debtor complied with this requirement, and also referenced Xtreme in its marketing materials.

21) In addition to these marketing costs, Debtor is also required to contribute up to $25,000 for joint marketing campaigns. Debtor has sought multiple times to confer with Xtreme, but Xtreme has not agreed to any of Debtor's proposed joint marketing campaigns and has not invited Debtor to join in any of its marketing campaigns.

22) Under the Second Amendment, Debtor and Landlord agreed that Tenant would be permitted to have interior signage. Specifically, Debtor is permitted to have interior signage "near the front of the building" and also to have "rights to the pro-rata portion of or dedicated panel on any existing or future pylon or monument". Although the signage required the Landlord's approval, such approval could not be unreasonably withheld.

23) Finally and as relevant here, the Second Amendment provided that, in the event the front desk area outside of the Premises was reconstructed and/or

expanded, the Debtor would be able to place its registration area and perform its registration activities within the expanded area.[2]

RELATIONSHIP BETWEEN LANDLORD AND XTREME

24)    Shortly after the Lease was signed on November 23, 2015, the Landlord introduced the Debtor's principals to Gary Canetti, then the operating manager of Xtreme. The purpose of this introduction was to inform the Debtor that Mr. Canetti was the Landlord's "man on the ground", that Xtreme would handle the Landlord's day-to-day operations and that if any issues were to arise, the Debtor's principals should inform Mr. Canetti who if necessary would escalate it to the Landlord's representatives. The only issues carved out from this very broad delegation of authority were roof leaks and locks and closing mechanisms for the exterior doors to the building.

25)    Mr. Canetti and Xtreme were described by the Landlord as the operational management for the facility which included the Premises. As detailed below, this included everything from HVAC project management activities related to planning, purchasing, installation, and cost reimbursement from Debtor, project management related to egress and fire safety planning and installation,

---

[2]    While there was a Fourth Amendment purportedly executed between the Landlord and the Debtor, the version referenced and annexed by the Landlord in its prior Motion to Dismiss does not represent the agreed upon terms. Specifically, terms were added that were not included in the negotiations between the parties and the version actually reviewed and signed by the Debtor.

project management related to bathroom planning, purchasing, installation, and cost reimbursement, project management related to the renovation and design of the marquee located on Powerline Rd. as well as the general day-to-day management issues such as hours of operation, repairs and advertising. In short, Xtreme was the de facto general contractor for the Landlord.

26) One example of this delegation of authority related to the HVAC system. The Lease and the Second Amendment provide that it is the Landlord who "shall also be responsible for the purchase and installation of HVAC for the Premises at a rate of 3 tones per 1,000 SF . . .[and that] Tenant shall reimburse Landlord for the actual, reasonable, costs of the units. Notwithstanding the foregoing, Tenant shall otherwise accept the Premises in As-Is condition."

27) It was Xtreme that acted on behalf of the Landlord and, who according to the Landlord, handled all negotiations with respect to the purchase and installation of this equipment which included dealing with the contractors.

28) When issues were raised by the Debtor concerning the warranties on the air conditioning equipment purchased for the Premises, the Landlord directed the Debtor's principals to deal with Xtreme notwithstanding that this was a Landlord obligation under the Lease.

29) This was not the only major project delegated by the Landlord to Xtreme. The Second Amendment provided that "Landlord shall further be responsible for

8

the construction of the communal restrooms located in Bay 5 at 5300 N. Powerline Road, which will be utilized by [Debtor's] patrons".

30) As with the HVAC purchase and installation, it was Xtreme that dealt with the contractors on behalf of the Landlord and ultimately approved contractor invoices for the construction of the bathrooms to be used by Debtor's customers. Xtreme also prepared the billing for the share apportioned to the Debtor. The Landlord then sent the invoices as prepared by Xtreme to the Debtor for payment. Copies of these invoices are annexed as Exhibit 4.

31) The Landlord also had Xtreme's general manager oversee the build-out of the Debtor's front wall including glass partitions that Xtreme later tried to receive reimbursement for on behalf of the Landlord.

32) Further, Xtreme provided project management, planning and purchasing services related to fire safety and egress planning (all of which were Landlord-related duties). See Exh. 1, section 12.

33) Xtreme was also the de facto project manager of the renovation project for the marquee. The Second Amendment provided that Landlord would provide Debtor with "rights to the pro-rata portion of or dedicated panel on any existing or future pylon or monument". Exh. 2, (sec. 3g). The Landlord directed Debtor to run its inquiries by Xtreme. Design, remodeling (of the old marquee) as well as allocation of advertisement space to other businesses

located next to Xtreme, were all delegated to Xtreme by the Landlord.    In
addition, the billing for space was determined by Xtreme.

34)    In electronic communications with the Debtor regarding the Lease or any
issue arising under the Lease, the Landlord routinely copied Xtreme and its
representatives as a way of keeping Xtreme apprised of the status with the
Debtor's operation.

35)    Even in face-to-face meetings with the Landlord, an Xtreme representative
was almost always present at the request of the Landlord. This practice started
shortly after the lease signing in 2015 and continued throughout 2018 and into
2019.

36)    One such example was the final negotiation for the HVAC reimbursement and
rent accommodation was in May/June of 2017. The negotiation team from
the Landlord included not only the principal of Landlord entity but also the
then acting operating partner of Xtreme, Aaron Parkinson. At the conclusion
of that meeting, the Landlord requested that the check payment due to
Landlord be delivered to Xtreme's bookkeeper.

37)    When issues arose with installation of a satellite front desk, Xtreme and the
Landlord met with the Debtor's principals to address how and where the desk
would be installed. Debtor was advised by the Landlord that Xtreme's general
manager would be the point person to resolve Debtor's issues with this

installation. The Landlord made it clear in a meeting with Debtor's principals that Xtreme was acting on its behalf.

38) Daily operations for the Landlord's facility were also routinely handled by Xtreme. This included such things as repairs to the Premises, monitoring the Debtor's activity and compliance with the Lease (i.e. demanding on behalf of the Landlord, the Debtor's evidence that it had a HVAC servicing contract) and daily hours of operation. For example, notwithstanding that hours of operation were set by the Landlord (per the Lease), when the Debtor's principal inquired as to whether it could adjust its hours for the 2019 Thanksgiving holiday, the Landlord told the Debtor to take it up with "management", meaning Xtreme.

39) When Xtreme's general manager sent the Debtor an email in early 2018 demanding copies of the Debtor's financials for a Landlord meeting, he made it clear that he was doing so as the Landlord's "proxy". A copy of this email is annexed as Exhibit 5. The Landlord never disavowed this representation.

40) In short, in various direct communications with the Debtor and its principals, the Landlord made it clear that Xtreme was its "rep".

## DEFENDANTS' WRONGFUL ACTS

41) The Debtor opened for business on November 22, 2016.

42) In keeping with the Lease requirements, Debtor operated its business "during all business hours established by Landlord as the hours of operation for the Property" except for times when the Lease allowed a later opening time or later or earlier close time and when the Landlord authorized the Debtor to confer with Xtreme about adjusting hours of operation.

43) Debtor's busy season begins in earnest on or about June 1st just as schools are ending their academic year. Because the Premises would be in a mall setting, the Debtor anticipated that customers visiting the mall, particularly ones with young children, would utilize the Premises. Debtor also targeted summer camps and other family-friendly groups.

44) For a brief period beginning in mid-2016 prior to Debtor's opening and through early Fall 2017, Xtreme and the Debtor engaged in cross-promotion advertising which benefitted both parties. For example, Xtreme included Debtor on its weekly email blasts, on its website, in brochures and rack cards. Debtor reciprocated and referenced Xtreme on its website and in its print advertising. This was in keeping with the Lease requirements and the fact that this warehouse space was created as a mall of family entertainment.

45) During the summer of 2017, the Debtor operated at a profit and saw its business steadily grow through its first full season.

46)    Beginning in late Fall 2017, the relationship between Xtreme and Debtor took a downward turn.  Since that time and as described below, Xtreme, acting in concert with the Landlord, deliberately sabotaged Debtor's business activities.

*Absence of signage and information for Debtor's business*

47)    The Lease, as amended by the Second Amendment, provides that the Debtor has the right to maintain signage near the entrance to the property.  See Exh. 2, sec. 3g.  This was particularly important to Debtor given that its location was towards the rear of the property and because it was surrounded by the Xtreme attractions.   All tickets to Xtreme's attractions were sold at a central front desk located at the entrance of facility.

48)    Signage was crucial in communicating Debtor's presence to Debtor's customers who were entering a facility named "Xtreme Action Park".  The only posters hanging directly outside of the entrance to the facility advertise the Xtreme attractions.  Copies of photographs showing the exterior of the warehouse facility are annexed as Exhibit 6.  Moreover the signage on the door leading into the facility references only Xtreme.  A photograph of the front door or "Access Point" is annexed as Exhibit 7.

49)    The Second Amendment permitted the Debtor to maintain a satellite front desk (adjacent to Xtreme's front desk) with its own separate line for customers.  This was also critically important as customers wishing to access

13

the Premises are required to proceed through the space occupied by Xtreme. Prior to Spring 2018, the Debtor maintained a satellite desk at the entrance to the entertainment facility alongside Xtreme. At this satellite front desk, customers would sign the required Rockin' Jump waiver forms and be checked in. It also functioned as the welcome desk for Debtor's customers. A copy of the front desk area showing the Debtor's satellite desk as it existed in May 2017 is annexed as Exhibit 8.

50)   In addition, upon entering the facility, there was an eight-foot long arrow-shaped sign with the Rockin' Jump branding (previously approved) that pointed customers in direction of the trampoline park. A photograph of this sign is annexed as Exhibit 9.

51)   All of this was ultimately taken away by the Landlord and/or Xtreme.

(i) misappropriation of Debtor's sign

52)   In or about April 2018, Debtor discovered that its eight foot arrow sign had been removed from the lobby of the facility. Xtreme did not admit to this misappropriation even though its staff carried the sign past the Debtor's Premises at the beginning of a busy day. Neither the Landlord nor management of Xtreme contacted Debtor to advise of the reason for the sign's removal.

53) Approximately six months after this removal, the sign was found by a subcontractor working for Xtreme in a storage area, which upon information and belief, was and is exclusively used and controlled by Xtreme.

54) Debtor requested that the sign be reinstalled at its original spot. Xtreme refused stating that the Landlord did not approve eight foot directional sign, even though it had initially been approved and was hanging in roughly the same spot for well over a year. Xtreme further stated that it would install a television screen and a separate "hanging sign" that Xtreme would pay for, asserting that this would be "more appropriate and quality signage that is in line with the facility".

55) Ultimately months later and well after the start of the busy summer season, the television screen was installed by Xtreme. However, this screen was a poor substitute for the eight-foot sign in that it advertised both Xtreme's business as well as Debtor's business and gave a significantly less amount of screen time to Debtor. Specifically, the television monitor provided only a 3 to 4 inch banner (as a compared to an eight-foot arrow sign) that referenced the trampoline park without any mention of Debtor's name. This banner, currently still in place, alternates every 6-8 seconds with an advertisement for Xtreme's Escape Room.

56) In addition, Xtreme is now using the television monitor to further promote its separate business interest called "Evolution Room", thus further diluting the amount of screen time that customers will be able to view Debtor's business/entertainment offerings.

57) No permanent signage comparable to the eight foot sign has been re-installed on Debtor's behalf.

*(ii) dismantling of Debtor's front desk*

58) Several weeks after the misappropriation of its eight-foot sign, Xtreme switched-off the power to Debtor's satellite front desk. While the Xtreme staff initially explained that this was due to a broken circuit breaker, it soon became apparent that this action was just another part of Xtreme's campaign to harm the Debtor's business.

59) When the power was initially cut the Debtor rented back-up battery systems to operate it's POS & TV at the satellite front desk for several hours at a time and during busy times, but this operation was very cumbersome, and the equipment was expensive to rent. This all became moot however when Xtreme dismantled the front desk entirely leaving the Debtor without any presence in the front of the facility, contrary to the terms of the Second Amendment.

60) The Landlord did not take any action against Xtreme for the dismantling of the desk. To the contrary, the Landlord's counsel directed the Debtor and its principals to remove its front registration desk because "Xtreme . . . will be reconstructing its front desk area". The Landlord cited to section 3h(c) of the Second Amendment to the Lease (Exh. 2) as justification for the removal which provides as follows:

> In the event that *Landlord reconstructs and/or expands the front desk area* outside the lease Premises within the building and said reconstruction provides sufficient room for Tenant to place the registration area within the same, the parties agree that Tenant shall be permitted to perform its registration activities, subject to the terms and conditions set forth by Landlord, in the above mentioned reconstructed and expanded front desk area. (Emphasis Added).

A copy of this letter is annexed as Exhibit 10 to the Complaint (emphasis added).

61) In or about the end of May and beginning of June 2018, Xtreme undertook renovations at its front desk area including the installation of kiosks to further its separate business interests.

62) Rather than provide a substitute area at the front of the facility because of this renovation, Xtreme deliberately delayed the operation of installing the necessary cables or installed them improperly, thus delaying a workable operation that Debtor needed in order to replace the satellite desk at the entrance. No reason was given for this action. The Landlord was aware of

Xtreme's conduct as the Debtor complained to the Landlord about this matter. However, its complaints went unanswered for several months.

63) Debtor was finally able to operate one sales position on a corner of Xtreme's front desk. The promised partitions were never installed by Xtreme or the Landlord and the hanging sign that the Landlord had promised (together with the banner on the TV) as adequate replacement of the Debtor's eight foot long arrow, was never installed by Xtreme.

64) In addition, Debtor was not allowed to install a hanging sign or any other Rockin' Jump branded posters or signs on Xtreme's front desk to alert guests of Rockin' Jump's presence.

*Intentionally blocking the view of Debtor's logo and limiting access*

65) During its renovation, Xtreme also expanded its ropes course. The expansion of the ropes course was positioned directly in front of Debtor's space and blocked the view of its logo.

66) During the actual construction itself, large areas were unnecessarily blocked off limiting direct customer access to its park and even interfering with the line of sight to the Debtor's park from the front of the facility.

67) Xtreme also positioned its arcade games directly in front of Debtor's front entrance window which limited visibility to Debtor's park. Only after Debtor raised this as an issue, and towards the mid-2018, did the Landlord finally

direct the removal of these arcade games. Since 2018, arcade games have crept back into this space, once again limiting guests' visibility to Debtor's business.

68) Following the completion of Xtreme's renovation, Debtor was not permitted to place any signage near the front entrance or against the back wall of the newly renovated front desk/ticket center. The Debtor's satellite desk that had once been positioned adjacent to Xtreme was replaced with kiosks selling Xtreme tickets only. Copies of photographs showing the revamped space advertising Xtreme attractions and the kiosks which replaced the Debtor's satellite desk are annexed collectively as Exhibit 11.

69) Nor are there any directional signs for customers once they enter the facility pointing out Debtor's business. In fact, upon entering through the Access Point, the only signage relates to the Xtreme attractions. The entrance is manned by an Xtreme employee who distributes activity maps. While the map references a trampoline park, Debtor's name is not mentioned. A copy of the map together with photographs showing the current directional signs are annexed collectively as Exhibit 12.

70) Without the reference to Debtor's name, any reasonable person would likely assume that the "Trampoline" signage is just one more aspect of Xtreme's business and not part of a Debtor's business. In short, Debtor's name is not

referenced anywhere inside the entertainment mall other than on the Premises which is contrary to the Second Amendment.

*No advertising*

71) As noted above, it was agreed between Xtreme and Debtor that the two businesses would cross-advertise and spend marketing monies on same. As also noted above, Xtreme had a tab on its website dedicated to Debtor which would then link to Debtor's website. However, Xtreme stopped all previously agreed upon advertising in or around February 2018.

72) Since early 2018, Xtreme has demanded additional payments from Debtor to provide it with the dedicated space on the outside marquee. As alleged above, the Landlord was obligated under the Second Amendment to provide the Debtor with a pro rata share of the marquee. The Landlord directed Xtreme to handle this project. The amount of the requested payment greatly exceeded the cost of the signage and Debtor was not allowed to install its own graphic. In addition, the basis of allocation was not related to any reasonable pro rata allocation as set forth in the Second Amendment.

73) Xtreme also wanted to allocate less space to Debtor than the Lease permitted. Copies of photographs of the marquee and the rendering of the space Xtreme was proposing to allocate are annexed collectively as Exhibit 13. The Landlord communicated to Debtor that it supported Xtreme's position and

that if the Debtor wanted space on the outside monument it would have to pay in accordance with the apportionment allocation set by Xtreme.

74) Upon information and belief, either the Landlord and/or Xtreme allocated marquee space to an unrelated transportation company located in a neighboring warehouse space but which has nothing to do with Xtreme. Moreover, the marquee has empty space, and in addition, continues to advertise the presence of an auto museum (connected to the Landlord) even though this museum closed months ago. See Exhibit 13.

75) Under the Second Amendment, the Landlord, cannot unreasonably withhold his consent to signage. Yet that is precisely what it did when it came to allocating marquee space and its unreasonable conduct was timed in such a way as to disrupt the busy 2018 summer season.

76) Debtor sought to compensate for this loss in advertising by staffing employees to greet Debtor's customers as they arrived and to direct them to the Premises. Once Xtreme learned of this, it threatened these employees with immediate ejection from the property. Notably, the Debtor was permitted to have a greeter at the front of the facility when Debtor first opened for business in late 2016.

*Other wrongful acts by Landlord/Xtreme*

### (i)    *Food service*

77)  The Lease prohibits the sale of food by Debtor.  In fact, only Xtreme is permitted to sell food within the facility. Debtor has abided by that restriction. Because of this restriction, Debtor, on behalf of its customers, would place orders in advance.

78)  Debtor has been targeted by Xtreme's significant delays in the delivery of food to Debtor's customers.  Debtor's patrons are limited to 45 minutes to eat their food in the party rooms on the Premises and, more often than not, receive their food deliveries more than 30 minutes after ordering.  Oftentimes the hot food that is ordered is delivered cold.

79)  The Debtor complained to both the Landlord and Xtreme about Xtreme's behavior regarding food services. The Landlord has done nothing to correct Xtreme's behavior and Xtreme continues to treat Debtor's customers different than its own customers in terms of food deliveries.

80)  This has negatively impacted Debtor's business and reputation.

### (ii)    *Lock-out Events*

81)  Xtreme has held several lock-out events in the facility.  A lock-out event is an event whereby a business purchases the right to use the amenities of the facility exclusively for its own employees or guests.  Under an agreement

reached between Xtreme and the Debtor, the Debtor was supposed to be paid for each guest of the business hosting the event. In addition, Xtreme agreed that it would not block access for Debtor's customers.

82) Nevertheless, at certain of the events held, Xtreme refused and/or deliberately delayed compensation to Debtor for the event(s). Moreover, Xtreme's employees turned away Debtor's customers that were part of the lockout event and/or otherwise blocked access for guests that were not yet inside Xtreme – so that they could not reach Debtor's Premises even when an agreement about an event was reached.

83) By way of example, during a corporate lockout event arranged for a certain local car dealership in late 2017, Xtreme positioned a staff member in front of Debtor's business advising the car dealership employees that Debtor was not part of the lockout event. At this same event, Xtreme also blocked the agreed upon access for Debtor's customers by telling arriving guests for the trampoline park that Xtreme was closed for a private event.

84) Xtreme willfully breached an agreement reached with Debtor to leave the facility open for Debtor guests during this lock-out event, as well as communicate to the employees/guests of the local car dealership that Debtor was open for them to enjoy the trampoline park. Debtor only found out about Xtreme's behavior because one of Xtreme's employees attempted to block

one of Debtor's owners from accessing the Premises during the lock-out event.

85) Xtreme continues to sell Debtor's business as part of lockouts even though it has no right to do so without the explicit permission of Debtor. This has happened on various occasions during the 2018 negotiations of the lockout pricing and Xtreme only informed Debtor of its sales activity several weeks before the actual occurrence of these events.

86) Upon information and belief, industry experience as well as several events arranged by Xtreme indicate that lockouts are booked 6-9 months before the actual event rather than several weeks in advance.

### (iii)    Customer Confusion

87) The Debtor, as a Rockin' Jump franchise, is required to have its customers sign a waiver before using its services.

88) Xtreme has been requiring Debtor's customers to sign a waiver upon entrance into the facility and have been telling those customers that this waiver covers not only the use of Xtreme's facilities but also the Debtor's business. Xtreme charges customers, including Debtor's customers $3.00 for each waiver.

89) Xtreme also leads Debtor's customers to believe that purchasing a pass through Xtreme not only gives it access to Xtreme's facilities but also to Debtor's park. In fact, this is openly promoted through use of Xtreme's

24

activity maps which are given to customers upon entrance into the facility. The map lists a trampoline park along with Xtreme's attractions but without mentioning the RJ name.

90)    In addition, Xtreme installed an A-frame size poster at the entrance doors to Xtreme directing all first time visitors to register at the Xtreme front desk or kiosks.

91)    Some of Debtor's customers have complained to the Debtor directly that when they called the general number for the Xtreme Action Park facility, they were told that same day groupon coupons would not only be accepted for the Xtreme attractions but also for the trampoline park.  Debtor's business does not accept same day groupon coupons.

92)    Moreover, Xtreme from time to time purchased ads on Google that appear to link Debtor's trampoline park with Xtreme's park attractions. The tab on Xtreme's website is only visible via the hyperlink in the Google ad.  Guests reviewing the attractions on Xtreme's website will not see any information about Debtor's business.

93)    Customers who wanted to use the Debtor's park have expressed anger with the Debtor because they believe that they were misled spending unnecessary money with Xtreme.  Some customers have refused to complete the Debtor's

waiver fearing they will be charged an extra $3 (which the Debtor does not charge).

### (iv)    Other disreputable business practices

94)    To accommodate Xtreme's customers and to avoid congestion, Debtor agreed to temporarily use a side entrance (used as an emergency exit-evacuation route) if there were large visiting groups. This side door is located on the Premises. However, against Debtor's wishes, the Landlord repainted the side entrance hallway which had previously been painted with the Debtor's signature green color. The wall space was also replaced with graphics unrelated to Debtor's brand.

95)    The Lease requires the Debtor to "complete or cause to be completed all deliveries, loading, unloading, rubbish removal, and other services to the Premises prior to the hours reasonably established . . . by Landlord."

96)    The Landlord often blocked Debtor's access to the loading dock on Monday evenings just as trash was about to be picked up.

97)    To avoid a health hazard, Debtor has had to make other costly arrangements to rid the Premises of the accumulated trash.

98)    Xtreme, upon information and belief, with the implied consent of the Landlord, has installed cameras throughout the interior of Debtor's Premises, including the spaces where the Debtor's employees conduct business.

99)   Nothing in the Lease mandates these interior cameras. Despite requests to the

Landlord to remove them, it has refused.

100)   As a direct result of the actions of Landlord and Xtreme as described above

and including the loss of interior and exterior signage, loss of a satellite front

desk to conduct business, being dropped from Xtreme's website, intentional

blockage by Xtreme of the Debtor's logo and access to its business , the

Debtor saw an approximately forty percent (40 %) drop in its revenue in when

compared to its 2017 season.

### COUNT ONE
### (BREACH OF COVENANT OF QUIET ENJOYMENT)
### against Defendant Landlord

101)   The Debtor repeats, reiterates and re-alleges the foregoing allegations of this

Complaint as if more fully set forth herein and further alleges the following.

102)   At all material times hereunder, Debtor fulfilled all its material obligations

under the Lease.

103)   Section 20.21 of the Lease, captioned Quiet Enjoyment, provides in pertinent

part as follows:

> Landlord represents and warrants that it has full right and
> authority to enter into this Lease. Landlord covenants that so
> long as Tenant pays the Rent and performs its other covenants
> and agreements herein set forth, Tenant shall peaceably and
> quietly have, hold and enjoy the Premises for the Term without
> hindrance or molestation from anyone claiming through
> Landlord, subject to the terms and provisions of this Lease.

104)    Under Florida Law, if a landlord authorizes acts to be done which cause substantial injury to the tenant in the peaceful enjoyment of the demised premises and such a result is the natural and probable consequences of the acts so authorized, the Landlord is liable.

105)    Defendant Landlord, through the actions of its agent, has materially breached its express and implied contractual duties to Debtor with respect to the other rights and privileges accorded to other commercial tenants renting from the Landlord--in this case, Xtreme. Xtreme's actions as described herein are therefore attributable to the Landlord. Such acts include but are not limited to:

a.    Misappropriating Debtor's signage;

b.    Cutting the power to its satellite front desk and thereafter dismantling the desk;

c.    Blocking access to Debtor's business during and following Xtreme's renovation;

d.    Refusing to place Debtor's business logo on the marquee;

e.    Intentionally dropping Debtor from the Xtreme website

    f.      Repainting the side hallway which previously reflected Debtor's colors and graphics with a color and graphics unrelated to Debtor's brand; and

    g.      Blocking Debtor's access to trash removal;

    h.      Installing cameras within the interior of Debtor's Premises, thus invading the privacy of Debtor's customers and Debtor's business interests;

    i.      Permitting Xtreme to engage in shoddy food services to Debtor's customers.

106) In accordance with the Lease, the Debtor contacted counsel for the Landlord in an effort to have the Landlord refrain from interference with Debtor's rights under the Lease. Specifically, by letter dated June 4, 2019, the Debtor notified Landlord that it should immediately cease and desist from interfering with and blocking access to Debtor's Premises and raised specifically ongoing problems with signage, front desk issues, non-delivery and/or late delivery of food and other misconduct. A copy of this letter is attached as Exhibit 14.

107) The Debtor raised many of these same issues in an earlier letter addressed to the Landlord's counsel in response to contrived complaints by the Landlord and Xtreme. Copies of the correspondence exchanged between the landlord and Debtor are annexed collectively as Exhibit 15.

108)    As a direct and proximate result of Defendant's breaches of these contractual duties to Debtor, Debtor has been damaged.

109)    Debtor's damages include lost revenue from its business and loss of the goodwill of its customers.

110)    Debtor is entitled to attorney's fees pursuant to the Lease.

WHEREFORE the Debtor respectfully requests entry of judgment against Landlord for compensatory and any other damages suffered by Debtor as a result of the Landlord's breach of the lease, including reasonable attorneys' fees and costs incurred in bringing the instant action, together with interest and such other and further relief as this Court deems just and proper.

## COUNT TWO

## BREACH OF THE IMPLIED DUTY OF
## GOOD FAITH AND FAIR DEALING

111)    The Debtor repeats, reiterates and re-alleges the foregoing allegations of this Complaint as if more fully set forth herein and further alleges the following.

112)    The Lease, including amendments 1-3 constitute a valid contract between the Debtor and the Landlord.

113)    The Landlord had an implied contractual duty to deal with Debtor honestly, fairly, and in good faith, so as to not destroy the right of Debtor to receive the benefits of the Lease.

114)     Debtor reasonably relied, and had a right to rely, on the following under the terms of the Lease and Second Amendment:

    a.      that Debtor could install and maintain sufficient interior signage, that at a minimum fairly and clearly alerted the consuming Public as to its business/entertainment offerings;

    b.    that its designated space (satellite front desk) near the Access Point would not be subject to interference so that Debtor could greet its customers, conduct its business, and direct them to its entertainment area;

    c.    that it should have been permitted to install its signage at the entrance to the property and at a front desk (above the point of sale); and

    d.    that it should have been afforded a pro rata allocation of space on the outside marquee.

115)     The Landlord's actions unfairly interfered with Plaintiff's right to enjoy the Premises.

116)     At all relevant times, all conditions required for Landlord's performance had occurred.

117)     At all relevant times, the Debtor was in full compliance with the Lease or was excused from having to comply.

118)   The Landlord failed to act honestly, fairly, and in good faith, and by doing so destroyed the right of Debtor to receive the benefits under the Lease when it engaged in the following acts:

   a.   misappropriated Debtor's signage;

   b.   disconnected power to Debtor's satellite front desk;

   c.   authorized the dismantling of Debtor's satellite front desk;

   d.   blocked access to Debtor's business;

   e.   willfully refused to provide signage on the marquee

119)   The Landlord's conduct did not comport with Debtor's reasonable contractual expectations as set forth above.

120)   On numerous occasions, Debtor advised the Landlord (through its agent) of the numerous breaches committed by Landlord and its agent as stated herein, however, Landlord failed to cure the breaches or otherwise ignored Debtor's pleas.

121)   The Debtor has been damaged as a result of Landlord's failure to act honestly, fairly, and in good faith of the Lease as Debtor did not get the benefit of its agreement, had to incur significant costs, including but not limited to lost revenue, and attorneys' fees and costs.

   WHEREFORE, as a consequence of the foregoing, Debtor has suffered, and will continue to suffer, damages.

## COUNT THREE

### (VIOLATION OF FDUPTA)
### against Landlord

122)     The Debtor repeats, reiterates and re-alleges of the foregoing allegations of this Complaint as if more fully set forth herein and further alleges the following.

123)     The Landlord's actions as described above, which are incorporated by herein, are in and affecting commerce in Florida and are unfair and deceptive competitive practices and constitute violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, et seq.

124)     The Landlord has permitted its tenant, and agent, Xtreme to economically squeeze and deprive the Debtor of customers to its attractions by (a) removing the Debtor's interior signage; (b) cutting power and then dismantling Debtor's front desk; (c) undertaking construction in such a manner as to deprive Debtor of the use and quiet enjoyment of its Premises; (d) prohibiting Debtor from adding its name to the marquee located at the street entrance to the property; (e) authorizing lock-out events for Xtreme's benefit which had the effect of driving Debtor's customers away from the Premises or, alternatively, driving them to Xtreme's attractions, and (f) removing Debtor from the facility's website, all advertising brochures and marketing materials distributed by its agent Xtreme.

33

125)    The aforementioned acts of the Landlord caused the Debtor actual damages in the lost ticket sales it suffered during the 2018 season and continuing to the present 2019 season, the increased advertising costs it was compelled to incur as the result of the aforementioned acts, and the out-of-pocket costs incurred in renting back-up battery systems to operate it's POS & TV at the satellite front desk for several hours at a time and during busy times after the power was cut by Xtreme at the beginning of the 2018 season.

WHEREFORE, as a result of  the Landlord's deceptive and unfair trade practices which have directly and proximately damaged the Debtor, the Debtor has been damaged in this State including the loss of business revenue from the 2018 full year and the recently completed 2019 summer season, the out-of-pocket expenses and increased advertising costs as referenced above, the damage to its competitive advantages it has earned in the marketplace and such other amounts as to be proven at trial.  Moreover, Debtor will continue to incur attorneys' fees and costs in this action and seeks recovery of said fees, costs and disbursements.

**COUNT FOUR**

**(VIOLATION OF FDUPTA)**
**against XTREME**

126)    The Debtor repeats, reiterates and re-alleges of the foregoing allegations of this Complaint as if more fully set forth herein and further alleges the following.

127)    Xtreme's actions as described above, which are incorporated by herein, are in and affecting commerce in Florida and are unfair and deceptive competitive practices and constitute violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, et seq.

128)    Xtreme has economically squeezed and deprived the Debtor of customers to its attractions by (a) removing the Debtor's eight foot directional arrow—even though previously approved by Landlord; (b) depriving Debtor's customers of use of the Premises during lock-out events and not reimbursing Debtor for loss of income during such events, and (c) misleading Debtor's customers by, *inter alia*, (i) giving them false information that the use of the facility includes the use of Debtor's Premises, (ii) incorporating the Debtor's park on its facility map without indicating that it is a separate business, (iii) informing customers that same day Groupons will be honored by Debtor, and (iv) having Debtor's customers pay for an Xtreme waiver that they did not need to use in the Debtor's park, and (d) purchasing ad space on Google making it appear that Debtor's business was part of Xtreme's attraction offerings.

WHEREFORE, as a result of Xtreme's deceptive and unfair trade practices which have directly and proximately damaged the Debtor, the Debtor has been damaged in this State including the loss of business revenue from the 2018 full year and 2019 summer seasons, the damage to its competitive advantages it has

35

earned in the marketplace and such other amounts as to be proven at trial. Moreover, Debtor will continue to incur attorneys' fees and costs in this action and seeks recovery of said fees, costs and disbursements.

## COUNT FIVE

## (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS)
### against Xtreme

129)     The Debtor repeats, reiterates and re-alleges of the foregoing allegations of this Complaint as if more fully set forth herein and further alleges the following.

130)     Debtor has certain rights vis-à-vis the Lease Agreement and Amendments with the Landlord, including without limitation, interior signage and other promotional rights.

131)     Up to the start of the 2018 season, Debtor had a good working relationship with the Landlord.

132)     Xtreme, which at all relevant times, knew the terms of Debtor's agreement with the Landlord, began a campaign of harassment and interference aimed at damaging Debtor's relationship with the Landlord. This included, *inter alia*, misappropriation of signage, interfering with and blocking customer's access to the Debtor's business resulting in customer complaints about the facility, dismantling of the Debtor's front desk, poor food delivery

36

services to Debtor's customers, and unfounded complaints about the Debtor to the Landlord related to lock-out events.

133)    The Landlord has become hostile to Debtor's business and its plans and has accused Debtor of disrupting the tenancy of Xtreme. The Landlord has also threatened to terminate Debtor's tenancy based on some or all these unfounded allegations.

134)    Due to the actions and misrepresentations and tortious interference by Xtreme, Debtor has been denied certain rights guaranteed to it under its Lease Agreement, including valuable advertising rights.

135)    Xtreme's actions constitute an intentional, unlawful and tortious interference with the existing and prospective business and/or contractual relationships of Debtor, including the continuation of a good working relationship with the Landlord.

136)    As a direct and proximate consequence of Xtreme's tortious interference, Debtor has been damaged.

137)    Debtor's damages include, but are not limited to loss of profits, income and business opportunities. Debtors reserve the right to claim punitive damages according to Fla. Stat. § 768.72.

WHEREFORE, the Debtor respectfully requests entry of judgment against Xtreme for compensatory and consequential damages suffered by Debtor as a

result of its tortious interference, including reasonable attorneys' fees and costs

incurred in bringing the instant action, together with interest and such other and

further relief as this Court deems just and proper.

Respectfully submitted  December 5,  2019

                LAW OFFICE OF KATHLEEN A. DALY, P.A.


                */s/ Kathleen A. Daly*
By:   Kathleen A. Daly

                515 N. Flagler Dr., Ste. P300
                West Palm Beach, FL 33401
                (917) 301-2437
                (561) 293-8514
                kdaly@kadalylaw.com

                Attorney for the Debtor