UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

In re:

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP                    Case No19-17544 - SMG
                                                                        Chapter 11

        Debtor,
_____/

SEVEN STARS ON THE HUDSON                         Adversary Proceeding
CORPORATION, d/b/a ROCKIN' JUMP,          No. 19-01230

        Plaintiff
v.                                                                           **EMERGENCY HEARING
                                                                             REQUESTED**

MDG POWERLINE HOLDINGS, LLC
AND XBK MANAGEMENT LLC,
d/b/a XTREME ACTION PARK,

        Defendants.

_____

## EMERGENCY MOTION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The Debtor and Debtor-in-Possession Seven Stars on the Hudson

Corporation, d/b/a Rockin' Jump ("Debtor") in the above-captioned Chapter 11 case,

requests that this Court enter an order granting this Emergency Motion for a

Temporary Restraining Order and Preliminary Injunction (the "Emergency

Motion") against XBK Management LLC d/b/a Xtreme Action Park ("Xtreme")

1

pursuant to section 105(a) of the Bankruptcy Code . <u>The Debtor requests that a hearing be set no later than Friday, December 20, 2019</u>.  In support of its Emergency Motion, the Debtor respectfully states as follows:

1)      Debtor's trampoline park is located within a larger facility run by Xtreme.  Xtreme has and continues to harm the Debtor by effectively shutting down access to Debtor's Park whenever Xtreme is conducting a private event.  Xtreme provides no notice to the Debtor in advance of these private events detailing time of the event and whether it is a total lockout or a semi lockout.  This creates uncertainty as to whether Debtor's guests are allowed to enter the facility and enjoy the trampoline park and all common areas.  The Debtor needs to be able to alert its customers and potential customers that, notwithstanding Xtreme's closing, the Debtor's park will continue to operate.  In a Chapter 11 reorganization, impairing a Debtor's right to conduct its business by shutting off access is a type of irreparable harm that will adversely affect the Debtor's ability to successfully reorganize and for which no adequate remedy at law exists.

2)      Because this is one of the Debtor's busiest periods (due to the holidays with children on break), Debtor will suffer greatly by these unwarranted surprise closings by Xtreme.  However, if a temporary restraining order is entered and later followed by a preliminary injunction, there will be no harm to Xtreme's business as all that is required of it is to provide notice to Debtor in advance of any such private

or semi-private events and to not impede access to Debtor's separate business by any miscommunication. To the extent that Xtreme intends or has scheduled any such event, the Debtor should be compensated at the rate agreed in the lease agreement meaning that Xtreme needs to compensate Debtor for 100% of its facility if it wants to reserve the exclusive right to Debtor's business. This is independent of whether Xtreme's guests actually use the Debtor's business or whether Xtreme simply needs to rent the Debtor's business in order to ensure exclusive access for its guests to the entire Xtreme Action Park facility.

3)      The Debtor respectfully requests that the Court enter two orders: 1) on an emergency basis – a temporary restraining order (the "Emergency Temporary Restraining Order") —which would immediately stay any further action that would have the effect of stopping customers from going to the Debtor's park, and 2) after an expedited notice and hearing, an order (the "Preliminary Injunction Order") continuing the relief granted in the Emergency Order pending the completion of a final plan of reorganization

4)      Forms of both proposed orders are attached as Exhibits 1 and 2 to the Declaration of Kathleen A. Daly, dated December 17, 2019. The proposed orders would direct Xtreme to immediately notify the Debtor of all planned lock-out or semi-private events so that the Debtor can adequately prepare in advance by notifying its customer base. The proposed orders would also prohibit Xtreme from

falsely claiming that the Debtor's Park is closed to the public during an Xtreme lock-out or semi-private event unless the Debtor is paid based upon the anticipated guests for such event.

## BACKGROUND

5)      The Debtor is the franchisee-owner and operator of a trampoline park known as Rockin' Jump and located at 5300 Powerline Road, Ft. Lauderdale, Florida.  The Debtor's business is approximately 22,000 sq. feet and is situated in a mixed use facility of sports and entertainment attractions approximating 200,000 sq. feet.  This larger facility is primarily comprised of attractions offered by Xtreme,  a gym and a basketball/volleyball facility.[1]

6)      The Debtor's Park is located at the back of the Xtreme Action Park facility.

7)      The Debtor leases its space from a Landlord, MDG Powerline Holdings LLC ("Landlord") which is affiliated with Xtreme.   They share one or more principals.

---

[1]      Besides the Debtor's business, the Xtreme's facility also includes a gym and basketball/volleyball courts that follow their own hours of operation and can arrange independent access to their respective facilities without being dependent on Xtreme. Xtreme does not list the sports complex (gym and basketball area) as part of its website and facility map.

8)    On June 5, 2019, the Debtor filed for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Florida.

9)    On July 17, 2019, the Debtor commenced an adversary proceeding against its Landlord and Xtreme.

10)    On December 5, 2019, the Debtor filed its first amended complaint, against the Landlord and Xtreme.

11)    The facts giving rise to this Emergency Motion occurred on December 6, 2019 when the Debtor's principals drove into the parking lot of the Xtreme Action Park facility and saw that Xtreme had shut down its facility for lock-out event.  This private event cut-off the Debtor and more importantly, the Debtor's customers' access  to the Debtor's trampoline park.

12)    A lock-out event is an event whereby a business purchases the right to use the amenities of the facility (in this case Xtreme Action Park) exclusively for its own employees or guests.  *See* Berding Decl. ¶ 7.[2]

13)    Upon information and belief, Xtreme contracted with an outside party to close the facility on to the public on December 6, 2019 for the exclusive use by the outside party for which only Xtreme benefited. Id.

---

[2]    References to Berding Decl. are to the paragraphs contained in the Declaration of Jens Berding, dated December 16, 2019 ("Berding Decl.").

14)     As Mr. Berding states, a greeter, employed by Xtreme, stationed outside the facility was telling anyone who approached the front entrance that the entire facility was closed.  This was wrong.  Debtor's Park was open for business. When Mr. Berding approached this greeter, he was also advised that the Park was closed. Id. ¶ 8.

15)     When Mr. Berding walked to the front entrance of Xtreme, there was a sign which stated the following:

**THIS PARK CLOSED UNTIL 3:00 P.M. TODAY FOR A PRIVATE EVENT**

Berding Decl. ¶ 11, Exh. 3.

16)     Only if someone actually approached the sign, would he/she have been able to see an additional statement, printed in small (not bolded) block letters underneath the Park Closure sign, stating "Trampoline Park Open All Day".   Id.

17)     However, this sign was of little or no value, because as noted above, Xtreme stationed a greeter in front of the facility and in front of this sign advising of a park-wide shut down.  Berding Decl. ¶ 12.  After Mr. Berding was finally permitted to enter, one of his staff members tried to gain access.  She was also told that the facility was closed, and she was initially denied access.  Id., ¶ 13.

18)     Xtreme's social media account (Instagram) also announced the closing of the facility for a "Private Event".  *See* Berding Decl. ¶ 14, Exh. 4.  As Mr. Berding

observed, Xtreme was turning away customers, even those who inquired about the trampoline park.  Berding Decl. ¶ 17.

19)    It was only when Mr. Berding continued to insist on his right of access as well as the right of access for both his customers and employees, and only after he sent one of his employees to the parking lot to greet customers alongside the Xtreme greeter, did Xtreme relent and agree to have its greeter announce that the trampoline park was open during this "Private Event" and to permit trampoline customers to enter through a side entrance not normally open to the public.  Id., ¶ 15.

20)    Even with this limited "accommodation", the Debtor was left short-handed for a portion of the day because, for a period of time, it had to station an employee-greeter in the parking lot of the facility to ensure that misleading information was not communicated to customers.  Id., ¶ 16.

21)    Moreover, because many of the Debtor's repeat customers know that the Debtor's park is located within the Xtreme Action Park facility, those persons would likely have assumed that the entire park was closed had they checked Instagram or Xtreme's website for hours of operation because there was no indication that Xtreme Action Park's closing did not prominently exclude the trampoline park or indicate that the Trampoline Park was open.

22)     This is not just speculation.  As stated in his Declaration, Mr. Berding has learned that several customers that tried to enter the Debtor's business that day were turned away by an Xtreme employee who advised falsely that the trampoline park was closed.  Berding Decl. ¶ 17.

23)     The Debtor lost customers as a result of Xtreme's actions that day. Id.

24)     The holiday season is about to begin.  It is anticipated that Xtreme will be conducting more lock-out events.  Without notice in advance so that Debtor can properly prepare, the Debtor's business will be negatively impacted by the loss of customers.  Id. ¶ 18.

25)     The Debtor notified Xtreme's counsel concerning the events of December 6, 2019 and proposed a remedy.  A copy of the email sent is attached to the Declaration of Kathleen A. Daly ("Daly Decl.") as Exhibit 7.

26)     To date, Xtreme has failed to respond to Debtor's concerns or to agree to any type of remedy.[3]

---

[3]     Xtreme has reluctantly agreed to one such joint event scheduled for January 11, 2020 and has paid the Debtor for the anticipated use of Debtor's park.  *See* Berding Decl. Exh. 5.

## **ARGUMENT**

**A.**   **THE DEBTOR IS ENTITLED TO A TEMPORARY RESTRAINING**
       **ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

27)   Federal Rule of Civil Procedure 65 sets forth the requirements governing the issuance of temporary restraining orders and injunctions. Bankruptcy Rule 7065 applies the requirements governing the issuance of injunctions as directed by Rule 65. The only difference is that the Debtor is not required to post security under Rule 7065 which is required under Fed. R. Civ. P. 65.

28)   To prevail on an application for a preliminary injunction and temporary restraining order, a movant generally must show that: (1) there is a substantial likelihood that the movant will prevail on the merits; (2) the movant will suffer irreparable harm unless the injunction is granted; (3) the threatened injury to the movant outweighs whatever damage proposed injunction may cause the opposing party; (4) the injunction, if granted, would not be adverse to public interest and (5) there is no adequate remedy at law. *Kapila v. Richard I. Clark as Trustee for Matthew Wortley Trust d/b/a X C. Finance (In re Trafford Distributing Center, Inc.)*, 414 B.R. 849, 856 (Bankr. S.D. Fla. Aug. 31, 2009) (internal citations omitted).

29)   Under  section 105 of the Code, this Court has authority to enter "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A temporary restraining order can be issued under the authority of this section. *See Phillips v. McLane Co., Inc., (In re*

*Fas Convenience Stores, Inc.)*, 296 B.R. 414 (Bankr. E.D. Va. 2002)(noting that court has the authority to enter the temporary restraining order under this provision provided that there is a showing that: 1) the balance of the harms weighs in favor of plaintiff, 2) plaintiff is likely to succeed on the merits, and 3) public policy favors granting the relief.))  The court in *Phillips* further stated that the first factor is the most important in terms of determining the appropriateness of issuing a temporary restraining order. Id. (*citing Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997)).

30)   In reaching its determination, the Court may consider "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc*., 51 F.3d 982, 985 (11th Cir. 1995).

**B.   THE DEBTOR IS LIKELY TO SUCCEED ON THE MERITS**

31)   As noted by the United States Supreme Court, "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources. . . ." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984), *superseded on other grounds by* 11 U.S.C. § 1113.[4]

---

[4]      *See also* Z. Liscow, *Counter-Cyclical Bankruptcy Law: An Efficiency Argument for Employment-Preserving Bankruptcy Rules,* 116 Columbia L. Rev. 1461, 1465, n. 11  (2016) (noting that, according to the legislative history of the current version of Chapter 11, its purpose was to "restructure business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.  It is more economically

32)    The surprise lock-out event on December 6, 2019 had the effect of imposing direct harm to the Debtor's business operations by preventing customers from accessing the Debtor's park.  The Debtor was forced to scramble at the last moment by having one of its staff stationed at the outside entrance to the Park in order to advise any entering customers that the Debtor was open for business. Berding Decl. ¶ 16.

33)    The acts as detailed in Mr. Berding's Declaration demonstrate an egregious interference with the Debtor's reorganization process.  As held by the Court in *St. Petersburg Harbourview Hotel Corp. v. First Union National Bank of Florida (In re St. Petersburg Harbourview Hotel Corp.),* 168 B.R. 770, 773 (Bankr. M.D. Fla. 1994), "the likelihood of success in the context of a Chapter 11 reorganization case is the Debtor's ability to obtain confirmation of its plan of reorganization".  Any attempts to interfere with that process will likely be looked upon as wrongful conduct.  *See* id.

34)    Moreover, Xtreme is already aware that its conduct is wrongful because it has agreed to pay the Debtor for use of its park in another event scheduled for January.  Berding Decl. ¶ 19, Exh. 5.  There is no plausible reason as to why it should

---

efficient to reorganize than to liquidate, because it preserves jobs and assets")(*quoting* H.R. Rep. No. 95-595, at 220 (1977)).

(without notice) be able to close off access to Debtor's park merely because it is having a private event.

35)     Thus the Debtor will be able to establish that it is likely to succeed on the merits at any scheduled evidentiary hearing as to its claim of wrongful interference.[5]  *See Levi Strauss*, 51 F.3d at 985 (in determining that an injunction is necessary, "the Court does not have to find that "evidence positively guarantees a final verdict in plaintiff's favor.")

C.     <u>**THE DEBTOR WILL CONTINUE TO SUFFER IRREPARABLE HARM**</u>

36)     As alleged in the First Amended Complaint, Xtreme is an agent of the Landlord.  *See* Daly Decl. Exh. 6, ¶¶ 24-40.

37)     Section 20.21 of the Lease, captioned Quiet Enjoyment, provides in pertinent part as follows:

> Landlord represents and warrants that it has full right and authority to enter into this Lease.  Landlord covenants that so long as Tenant pays the Rent and performs its other covenants and agreements herein set forth, Tenant shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from anyone claiming through Landlord, subject to the terms and provisions of this Lease.

Id., ¶ 103.

---

[5]     In its First Amended Complaint, the Debtor asserted claims of interference by Xtreme, including other lock-out events.  Daly Decl. ¶¶ 81-86.

38)    Xtreme's actions in shutting down its facility on December 6, 2019 where Debtor's facility is housed without any notice is an interference with Debtor's rights under the Lease Agreement.  As an agent of the Landlord, Xtreme is bound not to interfere with the rights of the Debtor to conduct its business.

39)    Even if Xtreme were not deemed an agent, it is nevertheless obligated not to interfere in the Debtor's business operations, because any such interference will negatively impact the reorganization process.  *In re Calpine Corp*., 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006)("[w]here there is a showing that the action sought to be enjoined would burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief.").

40)    Unless Xtreme is enjoined from its actions of shutting down the entire park without sufficient advance notice to the Debtor and its communication of misleading information to the Debtor's customers every time it holds a private or semi-private event, the Debtor's reorganization process will be significantly impaired.[6]

---

[6]    The Debtor is not seeking to prevent Xtreme from holding lock-out events.  However, the Debtor is entitled to advance notice so that it may appropriately plan and prepare (i.e. communicate with its customer base that the trampoline park will remain open during any such lock-out or semi-private event).

D.    <u>A BALANCING OF THE EQUITIES FAVORS THE DEBTOR</u>

41)    The purpose of the requested temporary restraining order and the preliminary injunction is to preserve the status quo.  Debtor is in the process of a reorganization and is already or about to embark on the busy holiday season. Suddenly shutting down the park without notice as Xtreme did on December 6, 2019 runs counter to the reorganization effort.  If fact, it seriously impairs that effort and by extension its ability to get back on its feet, confirm a plan and pay its creditors.

42)    Maintaining the status quo will not harm Xtreme in the slightest.  It can continue to hold its lock-out events so long as it makes it clear on its website and at its facility that the lock-out will not interfere with the Debtor's business operations. By providing sufficient notice, the Debtor can also properly prepare.  If Xtreme wants to include the Debtor in its lock-out event, it can confer with the Debtor with respect to pricing.  *See* Berding Decl. ¶ 19, Exh. 5.

43)    Moreover, a temporary restraining order is needed in order to prevent immediate and irreparable injury when the next lock-out or private event is scheduled by Xtreme.  As noted by Mr. Berding, because it is the holiday season, more events are likely to be held.  If the requested relief is not provided, the Debtor's reorganization effort will be seriously and irreparably undermined.

44)     The requested relief as set forth in both the Emergency Order as well as the Preliminary Injunction Order is also well within this Court's authority under section 105(a) of the Bankruptcy Code.

45)     The request for a temporary restraining order is only necessary pending a hearing on the Emergency Motion for a preliminary injunction.  As noted above, nothing in either order will impair Xtreme's ability to carry out any planned events. However, it will ensure that the Debtor's rights will not be impaired and will permit it to carry on as a going concern until such time as a plan is confirmed and creditors can be paid.

**E.**     **PUBLIC INTEREST FAVORS THE GRANTING OF INJUNCTIVE RELIEF**

46)     Granting the requested provisional relief will promote the public policy that underpins every chapter 11 reorganization.  *See Sharp v. SKMP Corp., Inc. (In re SK Foods, L.P.),* 2011 WL 10723414 (Bankr. E.D. Cal. Oct. 11, 2011)("the public has an interest in the successful and just resolution of the affairs of a bankrupt debtor).  In fact as noted by the court in *SK Foods, L.P.,* "'[i]n deciding whether to grant preliminary injunctive relief, Court must "pay particular regard for the public consequences....'". Id. (*quoting Winter v. Natural Res. Def. Council, Inc.,* 129 S.Ct. 365, 376-77 (2008)).

47)     Granting a limited injunction whose only effect will be to prohibit wrongful interference with the Debtor's business will ensure that the Debtor

continues to operate unimpeded during the holiday season which in turn will ensure payments to, among others, the Debtor's creditors, including Wells Fargo and the Franchisor.

48)    Nor will the issuance of the injunction impair Xtreme's business operations.  In fact, it will have no effect on such operations as Debtor has made it clear that it is not seeking to stop the lock-outs or change how they are conducted. It only asks for notification so that it may properly prepare and that Xtreme not communicate misleading statements to members of the general public who may wish to visit the trampoline park during any lock-out event.  There is also nothing to prevent Xtreme from including Debtor in the lock-out event at previously agreed upon prices.

## NO PRIOR REQUEST

49)    No prior relief for this form of injunctive relief has been made to this or any other Court.

## NOTICE

50)    Notice of the Emergency Motion has been provided to both Xtreme and its affiliate MDG Powerline Holdings, LLC which is the Landlord of the facility where the Debtor is located via ECF.   In addition, Xtreme was previously notified on December 11, 2019 as to the negative impact its December 6, 2019 private event

had on the Debtor, and proposed a remedy. *See* Daly Decl. Exh. 7. The Debtor never heard back from Xtreme with respect to its December 11th email.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Declaration of Jens Berding and exhibits annexed thereto, the Debtor respectfully requests:

(i) the entry of the Emergency Order, substantially in the form attached hereto as Exhibit 1, pending the entry of an order following a hearing,

(a) enjoining Xtreme from communicating that its facility is closed during a lock-out event without making it equally clear on its website, through the use of greeters and signage at the facility and in all uses of social media that the Debtor's park is open,

(b) directing that Xtreme provide the Debtor with immediate notice as to all scheduled private lock-out and/or semi-private events so that Debtor can properly notify its customer base that it is not affected by said lock-out event, and

(c) granting such other and further relief as may be just and equitable in the circumstances; and

(ii) following a hearing on the Emergency Motion, the entry of a provisional order, substantially in the form attached as Exhibit 2, continuing the relief granted in the

Emergency Order so long as necessary to carry out the provisions of the reorganization.

Respectfully submitted  December 17,  2019

                          LAW OFFICE OF KATHLEEN A. DALY, P.A.

                                  */s/ Kathleen A. Daly*

By:   Kathleen A. Daly

                                    515 N. Flagler Dr., Ste. P300
                                    West Palm Beach, FL 33401
                                    (561) 293-8514
                                    kdaly@kadalylaw.com

                                    Attorney for the Debtor