UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

In re:

SEVEN STARS ON THE HUDSON
CORPORATION, d/b/a ROCKIN' JUMP          Case No. 20-19106 - SMG
                                         Chapter 11

        Debtor,

_____/

SEVEN STARS ON THE HUDSON               Adversary Proceeding
CORPORATION, d/b/a ROCKIN' JUMP,        No. 19-01230

        Plaintiff

v.

MDG POWERLINE HOLDINGS, LLC
AND XBK MANAGEMENT LLC,
d/b/a XTREME ACTION PARK,

        Defendants.

_____

**DEBTOR'S OPPOSITION TO MDG POWERLINE HOLDINGS,
LLC'S MOTION TO STRIKE DECLARATION AND MOTION FOR SANCTIONS**

## INTRODUCTION

The Plaintiff-Debtor, Seven Stars On The Hudson Corporation, d/b/a Rockin' Jump ("Plaintiff") hereby submits this memorandum of law in opposition to the Motion of MDG Powerline Holdings, LLC ("Landlord" or "MDG") to Strike the Declaration of Eddy Manzo-Berding submitted in opposition to the respective motions by MDG and XBK Management, LLC d/b/a Xtreme Action Park ("Xtreme")[1] for summary judgment as well as the Motion for Sanctions under Fed. R. Civ. P. 37(c) (collectively the "Motion").

The crux of the Motion is that Ms. Manzo-Berding's Declaration (the "Declaration") submitted in opposition to each of the Motions for Summary Judgment filed by the Defendants (the "MSJ") is a sham affidavit offered solely to avoid summary judgment and that it should be stricken or disregarded by this Court.  Motion at 2.  MDG claims that the Declaration is inconsistent with Ms. Manzo-Berding's prior deposition testimony, the interrogatory responses and the initial disclosures submitted by Plaintiff, and that for the first time, Plaintiff is offering new theories of damages based on "diminution of business value" and reliance damages in the form of the cost of the investment associated with the building of the franchise.

However, the Declaration is not "inconsistent" to such a degree as to warrant the striking of the Declaration.  For one thing, Ms. Manzo-Berding did not solely rely on "lost profits" as a damage theory for all claims.  There is no statement in Ms. Manzo-Berding's declaration that indicates that lost profits are the sole and only theory that Plaintiff will rely on in this action.[2]  And while some of the questions appear to point in that direction, the questions were somewhat confusing (as discussed below).   Ms. Manzo-Berding did make it abundantly clear at the time of

---

[1]     By separately filed Joinder, Xtreme joins in the Motion.

[2]     Plaintiff incorporates its opposition to the Motions for Summary Judgment filed by both Defendants.

her deposition that Plaintiff would be relying on an expert to assist Plaintiff in providing the damage analysis.  At that time, Plaintiff had just secured litigation funding (approved by this Court), a portion of which (up to $25,000) was to be used for testifying expert costs.  However, following this deposition, Defendants succeeded in barring such testimony because the Expert Report had not been furnished by April 6, 2021.  As Ms. Manzo-Berding explains, because of that order, Legalist (the Funder) did not release any funds for the hiring of an expert—even a non-testifying one-- to assist Plaintiff on the issue of damages.  Because of this, Plaintiff's owners had to essentially become their own expert and lay before the Court the financial data supporting Plaintiff's claims as well as the impact of the Defendants' wrongful actions had on Plaintiff's business.

Plaintiff would also ask the Court to consider the fact that it has consistently stated and has submitted sufficient evidence that Defendants' actions were aimed at harming or destroying its business.  The deposition testimony in this case shows that Defendants were well aware of the diminution of business value.  In fact, Plaintiff has not just alleged that Defendant's ultimate goal was to destroy Plaintiff's business but, in fact, has even offered evidence to support that assertion.  For instance, in Plaintiff's Final Opposition Memo to Xtreme's Motion for Summary Judgment, Plaintiff referenced email communications between the Defendants and counsel about how to "beat [Plaintiff] into default." Opposition to XBK Management LLC d/b/a Xtreme Action Park Motion for Summary Judgment, Daly Decl. ¶ 1 (Goldfarb Dep. Ex. 26).

Defendants' actions have virtually eliminated Plaintiff's presence at the front of the facility notwithstanding Plaintiff's lease rights to signage. The front area of the facility is so important given that guests buy their Xtreme Action Park attraction tickets in this area before realizing that there might be additional attraction options at the back of the facility.

The record also shows that the Landlord understood Plaintiff was arguing the equivalent of the loss of business value.  MDG's counsel cross-examined Jens Berding at length on the value of the business.  *See* DE # 190, pgs. 48-50 (Bankruptcy Case Docket No. 20-19106).  Finally, during Ms. Manzo-Berding's deposition, she did not hesitate to point out the harm inflicted by Defendants.  She testified:

> Q.    And can you identify for me the evidence that Seven Stars has that the landlord was deliberately trying to harm your business?

> A.    Well, definitely the removal of the desk.  The removal of our interior signs, the arrow.  The fact that . . .  when we have the desk, the electricity was cut and the fact that the staff constantly misled guest when they come to the premises, delays the food, all these actions harm us.

Motion, Ex. C, pg. 237 (lines 5-13).

## THE DECLARATION SHOULD NOT BE STRICKEN

The content of Declaration does not amount to "a wholesale revision" of Ms. Manzo-Berding's  deposition testimony that would justify the harsh sanction of preclusion which is what Defendants seek here.   The "sham affidavit" as applied by this Circuit should be applied "sparingly."  *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir.2010);  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987). The opposing party bears a heavy burden to exclude an affidavit under the sham affidavit rule.  *In re Stand TV Seal, Products Liability Litigation*, 636 F.Supp.2d 1333 (N.D.Ga. 2009).[3]

Before a subsequent affidavit can be characterized as a sham and thus disregarded when considering summary judgment, the Declaration must contain statements that clearly contradict

---

[3]    Whether the damages are in the form of lost profits or loss of value, Plaintiff is entitled to put on evidence of both, particularly as there was a terminated business.  *See Bird Lakes Dev. V. Meruelo*, 626 So.2d 234, 238 (Fla. 3d DCA 1993)("[l]ost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract.")  Such profits are also recoverable for its claim of tortious interference.  *See Blueskygreenland Envtl. Solutions, LLC v. 21st Century Planet Fund, LLC*, 2014 WL 12515274 (S.D. Fla. July 22, 2014)(noting that lost profits are recoverable in tort claims); *Tymar Distribution LLC v. Mitchell Group USA, LLC*, 2021 WL 4077966 (S.D. Fla. Sept. 8, 2021)(past lost profits under FDUTPA recoverable)

responses to earlier unambiguous questions. The contradictions must be explicit and "consist of clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Van T. Junkins and Associates v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984); *Rollins,* 833 F.2d at 1530; *see also Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986).   An affidavit or declaration may not be disregarded as a sham where the differences between deposition testimony and affidavit are simply "discrepancies which create an issue of credibility that go to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986);  *In re Stand 'N Seal, Products Liability Litigation, supra*, at 1335.

As explained by the 11th Circuit in *Tippens*:

> We apply this rule sparingly because of the harsh effect this rule may have on a party's case. In addition, we feel that "[t]o allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the... affiant... was stating the truth."

Id., 805 F.2d at 953-54 (11th Cir. 1986).

Defendants have not claimed and cannot claim that Ms. Berding made statements that clearly contradict responses to earlier unambiguous questions. As demonstrated below, Ms. Manzo-Berding explained why she could not give a definitive answer at the time of her deposition. *See* Declaration of Eddy Manzo-Berding, dated September 10, 2021, ¶ 9.  She should not be now penalized for providing further information as to the question of available damages based on further investigation and research conducted after this Court denied the motion to extend the expert discovery deadline.

## A.    ALLEGED INCONSISTENCIES WITH DEPOSITION

MDG's asserts that it "repeatedly asked what, if any, actual damages Plaintiff allegedly suffered because of the alleged conduct in the Second Amended Complaint" and claims that  Ms.

Manzo-Berding's answer was that Plaintiff was only seeking damages related to "lost revenues from declining sales". Motion pg. 5. MDG further claims that Ms. Manzo-Berding did not testify to out-of-pocket expenses that Plaintiff was pursuing and could not answer with respect to the classes of available damages. However, Ms. Manzo-Berding did testify as to the reason the Plaintiff could not provide a more precise answer regarding the classification of damages— because Plaintiff needed the assistance of an expert which she anticipated in this case. "Well, it looks simple for you, because you are the legal counsel, but to me it doesn't look simple because I don't know what else or other type of damages are out there….I don't know the classification of damages. Sorry, but that 's where I cannot feel assertive about answering that question. I don't know all the type of damages there are out there. You see, that's the reason I don't answer assertive." Motion, Ex. C, pg 147, lines18-25. Ms. Manzo-Berding made it clear that the analysis of damages centered on the steep decline in revenues as well as Defendants' actions in isolating Plaintiff's business. She testified: "I think our position here is that the lack of signage interior and exterior both combined. Because it was removed, impacted on people finding us and therefore selling tickets to them. It's a comprehensive element." Motion, Ex. C, pg. 145 (lines 24-25) – pg. 146 (lines 1-2). She was not evasive-she was direct. At the time she testified, this Court's order barring expert testimony had not been entered and Plaintiff fully expected to be able to rely on expert testimony for damage analysis. In fact, the Court entered an order approving the litigation funding agreement on April 14, 2021, which was eight days after the expiration of the April 6, 2021 due date for expert reports and five days before Ms. Manzo-Berding testified.

MDG's further argument that Ms. Manzo-Berding "failed to identify any out-of-pocket or actual damages" is also somewhat misleading. Motion, pg. 6. MDG's counsel asked her whether she was seeking out-of-pocket damages related to specific wrongful acts by Defendants. What

should be remembered is that the Second Amended Complaint was based on cumulative and escalating wrongful acts.  *See* Daly Declaration (Aug. 17, 2021), ¶ 5 (Ex. 4, ¶¶ 112, 121, 131, 135, 139, and 152-53).  Thus, the cost of a replacing a poster might not amount to much, but the removal of the poster along with other interior and exterior signage, and obliteration of any presence in the front of the facility, would have a direct and discernable impact on foot traffic to the Leased Premises.  Motion, Ex. C, pgs. 145 (lines 17-25) - 146, (lines 1-2)(describing the impact of Defendants' actions as having a "comprehensive" impact).

MDG's assertion that Ms. Manzo-Berding "***expressly denied***" that Plaintiff was "seeking to recover for any actual expenses incurred prior to June 15, 2017", misrepresents her actual testimony in which she merely responded to a question as to whether she was seeking a recovery for harm that occurred prior to 2017.  She testified:

Q.      I'm trying to figure out if you're claiming in your lawsuit some kind of harm that you – that Seven Stars received or claims it received prior to the signing of this—of this Amendment against the landlord in particular?  For instance, are you – are you seeking damages related to the HVAC system?

A.      No.

Q.      Are you seeking damages relating to the construction of the bathroom?

A.      No.

…

Q.      … Is Seven Stars claiming damages relating to any signage issues that arose prior to June of 2017?

A.      Signage, yes.

Q.      . . . Can you tell me what –

A.      Prior to it, no.  Prior to it, no.

Q.      . . . So the signage issue in the complaint arose after this amendment was executed? Is that your testimony?

A.    The signage issues, yes.

Motion, Ex. C, pg. 206 (lines 8-17) – 207 (lines 1-10).

MDG also distorts her testimony by asserting that she only testified as to "lost profits" when in fact she testified to lost revenue from lost ticket sales.  It is MDG that repeatedly uses the term "lost profits" interchangeably with "lost ticket sales" and in some instances uses profits and revenue interchangeably. *See* Motion pg. 7.  The following exchanges demonstrate this:

Q.    … I'm apologizing if this seems technical.  But so it sounds like what you're describing is you are seeking lost profits and damages.; is that true?

A.    Well, as you know, I'm not a technical expert . .  I cannot affirm or say this is loss of profit, this is a loss of income, you know.  I cannot define this technical aspect but what is for sure is that if you cannot see, us, you cannot find us, that translate into not selling tickets.

Motion, Ex. C, pg. 144 (lines 15 – 20) – pg. 145 (lines 1-6).

In another example, she testified:

Q.    …are the damages you're seeking regarding the arrow, lost profit, lost ticket sales, is that the type of damages you're seeking?

A.    Yes.

Motion, Ex. C, pg. 171 (lines 9-12).

And in yet another example, she testified:

Q.    … You are trying to claim revenues or profits that you say you would have received if you had better signage or if the signage on the front – I just want to talk at the moment just about that poster by the front door, you believe you would have received more income or more profits had that signage remained.  That's your theory?

A.    I think our position here is that the lack of signage interior and exterior both combined.  Because it was removed, impacted on people finding us that therefore selling tickets to them.  It's a comprehensive element.

Motion, Ex. C, pgs. 145 (lines 17-25) – 146 (lines 1-2).

Ms. Manzo-Berding made it abundantly clear that the factual basis for the damages sought stemmed from the wrongful actions of the Defendants and that there was a clear link between these wrongful actions and the economic harm to the business.  She testified:

Q.    And can you identify for me the evidence that Seven Stars has that the landlord was deliberately trying to harm your business?

A.    Well, definitely the removal of the desk.  The removal of our interior signs, the arrow.  The fact that . . . when we have the desk, the electricity was cut and the fact that the staff constantly misled guests when they come to the [Leased Premises], delays the food, all these actions harm us.

MDG Ex. C , pg. 237 (lines 5-13).

That she was not certain of answers to all the questions asked--several which were ambiguous and unclear--is not a reason to strike her Declaration.  As the Court in *Tippens* held, "[t]o allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth." *Tippens* 805 F.2d at 953-54; see also *Strickland v. Norfolk S. Ry. Co*., 692 F.3d 1151, 1162 (11th Cir. 2012) ( "[where] the apparent contradiction derives not from purposeful fabrication but instead from dialectical misunderstanding ... any apparent contradiction becomes 'an issue of credibility or go[es] to the weight of the evidence").

MDG's motion to strike her Declaration because she did not provide this information during her deposition is clearly an unwarranted and harsh sanction in the absence of conduct evincing deliberate and contumacious conduct, particularly considering that MDG has not proven the existence of any clearly contradictory statements. As Ms. Manzo-Berding explains, the information regarding valuation was determined after consultation with counsel and based on caselaw that referred to loss or diminution of business value as an alternate theory of damages.

This loss of value is pertinent here given that there is no longer a franchise, and Defendants' actions in isolating Plaintiff's business, the lack of signage and no presence at the front of the facility has all contributed to the business' diminished value.  If Defendants engage in behaviors that are designed to ensure Plaintiff's foot traffic is substantially decreased, the Park's business value will be very low.

There is nothing "inherently inconsistent" in her Declaration that would warrant striking it.  *See Allen v. Bd. Of Pub. Educ for Bibb Co*., 495 F. 3d 1306, 1316-17 (11ᵗʰ Cir. 2007) (*quoting* Rollins, 833 F.2d 1525, 1530(11ᵗʰ Cir. 1987)).[4] Certainly, at a trial, Defendants would be free to cross-examine her if there was any substantial difference between her deposition testimony and her Declarations that could not be plausibly explained.  *See Continental Cas. Corp. v. First Financial Employee Leasing, Inc.,*  716 F.Supp.2d 1176, 1191 (M.D. Fla. 2010) ("[a]lthough Rule 30(b)(6) testimony is that of the corporation, it does not constitute a judicial admission and the corporation "is no more bound than any witness is by his or her prior deposition testimony.  A witness is free to testify differently from the way he or she testified in a deposition, albeit at the risk of having his or her credibility impeached by the introduction of the deposition.") [5]

**B.**    **ALLEGED INCONSISTENCIES WITH INTERROGATORY RESPONSES**

---

[4]     MDG's contention that Ms. Manzo-Berding is not qualified to set forth the EBITDA values is specious. Plaintiff produced its financials during discovery and MDG has always had access to Plaintiff's financials as it was a creditor in Plaintiff's bankruptcy and even cross-examined Plaintiff's principals at length during multiple hearings held in the Bankruptcy case. *See* MDG Motion for Summary Judgment Ex. G.   In any event, the EBITDA values are a mathematical computation based on financials already in MDG's possession.  As the Court held in *Nephron Pharmaceuticals Corporation v. Hulsey*, 2020 WL 7684863 (M.D. Fla. Oct. 7, 2020)"it has been no secret what damages Plaintiff seeks, and the damages do not require complex calculations"(internal citation and quotation omitted).

[5]     Ms. Manzo-Berding throughout her deposition candidly responded to questions regarding damages and the intent to rely upon an expert to advise as to how to measure the damages.  This is not an example of Plaintiff acting coyly and feigning ignorance. Rule 30(b)(6) only requires that the corporate entity designate and prepare an individual to testify as to all delineated information "known or reasonably available to the organization" at the time of the deposition.   That is exactly what she testified to.

MDG makes two arguments relating to inconsistency between the Interrogatory Responses (as amended) and Ms. Manzo-Berding's deposition.  First, that Plaintiff improperly referred to settlement discussions.   Second, that  Plaintiff failed to identify the "specific *types* of or bases for its damages claim".  Motion at 9.  Note that MDG is not alleging that Ms. Manzo-Berding made clearly contradictory statements which would be the scenario contemplated in the previously cited case law (*see Van T. Junkins and Associates v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984); *Rollins,* 833 F.2d at 1530; *and  Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) Rather, MDG is merely claiming "inconsistencies" which Plaintiff addresses as follows:

Plaintiff did not disclose settlement discussions.  Rather, Plaintiff responded to a request by Defendants for a breakdown in damages sought including a basis for its contract damages. Plaintiff also provided a chart showing its losses which tied directly to Plaintiff's financials. Manzo-Berding Declaration ¶ 5.  Moreover, Plaintiff provided the basis for its damages.   It sets forth in detail the wrongful acts by Defendants and that these acts warranted punitive damages.

Not to belabor the point, Plaintiff anticipated that it would have an expert and specifically sought outside funding for expert expenses.  *See* Bankruptcy Case 20-19106, DE # 22, ¶ 9. Counsel for the Debtor submitted the Agreement for approval of the litigation costs including expert fees.  Id, DE # 186, p 7.  *See also* DE # 190, ¶ 7-8.  Not surprisingly, MDG objected to any litigation funding for Plaintiff.  DE # 190.  Following a hearing, this Court granted the Motion for outside litigation funding, which included a provision for funding experts, on the very day the expert report was due.  DE # 191.  In testifying as to her reliance on an expert, Ms. Manzo-Berding was reflecting the position of the Plaintiff in anticipating the assistance of an expert on the issue of damages.  There was no gamesmanship here.  *See Allen Russell Publi'g, Inc. v. Levy*, 109 F.R.D.

315 (N.D. Ill 1985)(holding that good cause existed to vacate a default given the defendant's inability to procure counsel due to lack of funds).[6]

With respect to MDG's assertion that the interrogatory responses only identified one item of damages—"loss of profits", the responses also asserted that it "lost substantial revenue and lost a valuable franchise relationship". Motion, Ex. D, pg. 5.   What this Court should not lose sight of is that the Plaintiff entered into a franchise agreement and procured financing of $1.4 million with the Berdings contributing approximately $600,000 in equity.   The franchise has been terminated. Given Defendants' wrongful acts, it is unlikely that Plaintiff could sell its business for an amount to recoup the investment value.   This also comports with Defendant-owners' view that the owners would be able to purchase Plaintiff's business through the bankruptcy process for "pennies on the dollar."  *See* MDG Motion for Summary Judgment, Ex. D, pg.  253 (line 14)

## THE SANCTION OF PRECLUSION IS NOT APPROPRIATE

MDG refers to "repeated and undeniable discovery violations" that merit sanctions under Fed. R. Civ. 37(c) but refers only to the inability of Plaintiff to secure an expert by April 6th and deficient discovery served that acknowledged that Plaintiff would supplement when it obtained an expert.   Yet nowhere can MDG's counsel point to any communication to Plaintiff regarding these alleged "repeated and undeniable discovery violations".   Defendant MDG raises it for the first time on summary judgment, which itself is improper.  *See Nephron Pharmaceuticals Corporation v. Hulsey***,** 2020 WL 7684863 (M.D. Fla. Oct. 7, 2020), ("rather than raising this issue as a discovery

---

[6]      While MDG has argued in the past that Plaintiff had two years to procure an expert and that its failure to do so was dilatory, this was and is not true.  Plaintiff faced two motions to dismiss from MDG, predicated upon the argument that MDG could not be held responsible for another tenant's (Xtreme) wrongdoing.  *See* DE # 24 and 39. Yet we now know that this was a misleading argument that delayed this litigation for nearly a year.  Indeed, MDG continued to assert this position in its Answer (denying the allegation that Xtreme functioned as the manager and asserting  affirmative defenses that Xtreme was not its agent).  *See* DE # 135, ¶¶30-31 and First and Fifth Affirmative Defenses.  In fact, MDG **only** changed its position for the first time when it filed its motion for summary judgment, conceding that Xtreme was its manager.  DE # 161, pg. 2 (noting Xtreme's position as "manager").  This is nearly two years ***after*** Plaintiff filed its complaint.

matter earlier in the proceedings, Defendants have waited until summary judgment to, in essence, use Nephron's discovery failure as a complete bar to Nephron's claims. This result is untenable")(*citing Cheney v. IPD Analytics*, 2009 WL 4800247, at *5 (S.D. Fla. Dec. 11, 2009)[finding "no merit as it would render most of Fed. R. Civ. P. 26 useless and would encourage parties to resolve their discovery disputes at the summary judgment stage"]); *see also XTEC, Inc. v. Cardsmart Technologies, Inc.*, 2014 WL 10250973 (S.D. Fla. Dec. 2, 2014)("to the extent that Defendants now seek to raise the wholesale failure to disclose under Rule 26 outside of the discovery period, this Court finds that such argument has been waived.)

Having lost on its objections to the Court regarding Plaintiff's motion to obtain litigation funding, MDG found a new way to preclude Plaintiff from moving forward with the vital assistance of an expert on damages and simultaneously have the case dismissed notwithstanding the clear and convincing evidence of MDG's participation in forging a lease amendment, refusing to permit signage, and wrongfully interfering with the franchise relationship. All this forced Plaintiff into bankruptcy scenario that was not only foreseeable but was specifically contemplated and sought by the owners of Defendants. As Jens Berding testified regarding his discussion with David Goldfarb:

Q.      . . . do you have an understanding as to what would be their motive to interfere in your relationship with them MDG?

A.      Yes, personal gain. The benefit of us not succeeding was to make more money themselves and to at the end being able to buy the park from us as David Goldfarb in a meeting in the fall of 2000 put it, well, I guess all the other markers are too expensive for us and we'll buy you out of bankruptcy for pennies on the dollar. So there was a clear vision of what would happen if we were not to succeed and that the investment would fall to them and they would pick it up for pennies on the dollars.

Q.      When did Mr. Goldfarb make that remark?

A.      When we had, you know, we had worked through the summer of 2018. We had sort of stopped making payment to the –to the bank. I approached him and I said your actions are

showing effects and can we try to find a solution.  Because it was never our intention to come to Florida and to fight and have to sort of being in a contentious relationship with out co-tenant.  But we saw that they chose to take that stand and so we try to resolve the issue in a meeting.  And basically in the meeting he asked me how much it cost to build the park and he indicated that that was too expensive for them to pay over $2 million.  And he asked me, well, if we pay off your loan and you get out of here, how much is the SBA loan and I said at that point it was probably 1.2, 1.4 million.  He said that was too expensive.  He still couldn't envision paying that amount of money, and then basically he said we will buy you out of bankruptcy for pennies on the dollars That's how it's going to go down because he didn't see any other alternative for us.

Q.    Right.  When was that meeting?

A.    That's in the fall of 2018.

Q.    Had Seven Stars already filed bankruptcy at that point?

A.    No.  . . . we couldn't even get things that were spelled out in the lease.  Like the pylon signage, after we couldn't get these things from them, it was clear that, you know, we had very little alternative than to look for another solution and that was the attempt to negotiate and see whether there was any interest in resolving this amicable and it left us with a clear understanding of what they know the power  and the position that the landlord had and that they could wait it out. . .

MDG Motion for Summary Judgment, Ex. D, pg. 252 (lines 8-25) – pg. 254 (lines 1 – 6).  *See also*

Manzo-Berding Declaration 9/10/21, Ex. 1 (MDG 3824 – Mary Bertoni, MDG's CFO stating in

July 2018 that if Plaintiff stopped paying rent, MDG would be "in a very good position with  bank

to take over his assets at a discount").

The U.S. Trustee also took issue with MDG's lack of "full candor toward this tribunal" in

waiting until after the due date for expert reports passed to raise objections.  The Court did not

even approve the litigation funding agreement until April 14, 2021.  As the U.S. Trustee pointed

out in response to MDG's objection to the litigation funding and the expert witness deadline, "[a]s

the estate fiduciary had insufficient funds to retain experts prior to the Legalist agreement, it is

conceivable the estate fiduciary could not retain an expert without Mr. Green's appearance in the Adversary Proceeding." DE # 192, pg. 7.[7]

A.    **RULE 37(C) SANCTIONS ARE NOT AUTOMATIC**

Fed. R. Civ. P. 37(c) provides in pertinent part that: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, ***unless the failure was substantially justified or is harmless*** (emphasis added). "The main purpose of Rule 37(c)(1) is to 'prevent[] surprise and prejudice to the opposing party.'" *Henry v. Bradshaw*, 2008 WL 11409966 at *3 (S.D. Fla. May 19, 2008)(*quoting Whetstone Candy Co., Inc. v. Nestle USA, Inc.,* 2003 WL 2568630 * 3 (M.D. Fla. 2003)).

B.    **RULE 37(C) SANCTIONS ARE NOT WARRANTED**

A court's determination as to whether failure to make sufficient expert disclosures or any other additional discovery beyond the deadlines contained in the scheduling order is substantially justified or harmless is normally based on the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *See Mobile Shelter Sys. USA Inc. v. Grate Pallet Sols, LLC*, 845 F. Supp. 2d 1241, 1250-51 (M.D. Fla. 2012). Ultimately, "[f]ailure to disclose is 'harmless' where there is no substantial prejudice to the party entitled to receive the disclosure." *Poole v. Gee*, 2008 WL 2397603 at * 2 (M.D. Fla. June 10, 2008).

---

[7]    To be noted also, all the agreed scheduling orders entered in this case contemplated the completion of fact discovery before expert discovery. MDG only objected to an extension after the April 6th date passed with no designation of experts, which on the part of Plaintiff, was due solely to the inability to fund this expense which was a secret to no one—hence the need for and approval by the Court of the litigation funding agreement.

As to the first factor, the loss of investment value of $1.9 million should hardly surprise MDG as there is evidence that Mr. Goldfarb was aware of this as early as 2018.  *See* MDG MSJ Ex. D, pg. 252 (lines 8-25) – pg. 254 (lines 1 – 6).  Moreover, MDG's counsel cross-examined Mr. Berding at length about the valuation of the business.  *See* DE # 190 pgs. 48-50.  This factor favors Plaintiff.

As to the second factor, the ability of that party to cure the surprise, Defendant has known for some time that Plaintiff wanted to pursue expert discovery because of the difficulty in determining damages.  Defendants have also been aware for some time that Plaintiffs have consistently claimed that Defendant's ultimate objective was to destroy Plaintiff's business which logically results in a diminution of the business' value.  The Court could re-open discovery for the limited purpose of taking expert depositions.  This would cure any claimed surprise.  *See In re Complaint of Kreta Shipping, S.A.*, 181 F.R.D. 273, 278 (S.D.N.Y 1998) (court afforded party an opportunity to "cure their disclosure failures" by permitting opposing party to depose experts "on new matters contained in their new expert reports").

In addition, the photographs that MDG wants stricken should not come as a surprise to Defendants as Defendants' corporate representatives identified similar photos taken of the Xtreme facility.  *See* Manzo-Berding Decl. ¶ 12.  Moreover, many of these photos were attached to the second amended complaint and until this Motion, were never challenged by the Defendants on either authentication or admissibility grounds.  This factor favors Plaintiff.

As to the third factor, this Court has not yet a trial date so there would be no disruption. This factor favors Plaintiff.

As to the fourth factor, as Defendants have made clear, damages are a significant part of any claim.  On this point, Plaintiff shares this view.  Plaintiff did not delay and acted expeditiously

in securing litigation funding.  Because Courts favor decisions on the merits, this factor should weigh in favor of permitting Plaintiff to supplement  evidence of its damages.

Finally, as to the fifth factor, when this Court denied the extension for the expert discovery deadline, Plaintiff sought funds from the litigation funder, Legalist, to retain an expert to adequately prepare updated interrogatory responses . Manzo-Berding Declaration, ¶ 7.  The funder took the position that it no longer needed to fund this category considering this Court's May 13, 2021 Order.  Id., ¶9.   In addition to these guiding factors, courts generally do not preclude expert testimony or other critical evidence if the preclusion will result in the dismissal of the case unless there has been a determination of willfulness or other deliberate misconduct.  *See Catalina Rental Apartments, Inc. v Pacific Ins. Co., Ltd*., 2007 WL 1050634 (S.D. Fla. April 3, 2007)("striking Defendant's expert witnesses would be a harsh sanction, especially considering that there is no evidence of bad faith on the part of the Defendant and that the expert testimony is fundamental to Defendant's case. Excluding this "critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence"); *see also Prieto v. Total Renal Care, Inc.,* 2019 WL 2510003 (S.D. Fla. June 18, 2019)("striking expert testimony is a harsh sanction that should not normally be imposed absent a showing of willful deception of 'flagrant disregard' of a court order by the proponent of the evidence." )(internal citations and quotation marks omitted).

There has been no finding that the Plaintiff has acted in a flagrant disregard of this Court's rules.  To the contrary, Plaintiff has acted in good faith throughout its Bankruptcy Case.  Manzo-Berding Decl. ¶ 13.  There is substantial evidence before this Court as to Defendants' wrongdoing. Permitting this case to proceed without affording Plaintiff the ability to adequately prove its damages would essentially be rewarding the Defendants for its bad behavior.  Their deliberate

actions caused the Plaintiff to go from being a viable going concern to one requiring bankruptcy protection.  Defendants clearly knew what they were doing, as they anticipated they could purchase Plaintiff's business assets for "pennies on the dollar" as Mr. Goldfarb stated.

## **CONCLUSION**

For the foregoing reasons, MDG's Motion to Strike Ms. Manzo-Berding's Declaration and the Motion for Sanctions should be denied in its entirety and the case should be permitted to proceed to trial.

Dated:  September 10, 2021

LAW OFFICE OF KATHLEEN A. DALY, P.A.


_____*/s/ Kathleen A. Daly*_____
By:     Kathleen A. Daly (Fla. Bar No. 112438)

515 N. Flagler Dr., Ste. P300
West Palm Beach, FL 33401
(917) 301-2437
(561) 293-8514
kdaly@kadalylaw.com

Attorney for the Plaintiff